Strafford, }
Feb. 1, 1938. }

LEON E. SYLVAIN *v.* GUSTAVE C. PETERMAN.

ALICE M. SYLVAIN *v.* SAME.

*Hughes & Burns* and *Charles F. Hartnett* (*Mr. Burns* orally), for the plaintiffs.

*Arthur E. Sewall* and *Thomas L. Cleaton* (*Mr. Sewall* orally), for the defendant.

PAGE, J.   The defendant admitted liability.   It was agreed that Leon E. Sylvain's property damages amounted to $300.   The only questions left for the jury to determine related to the other damages.

The collision occurred on a Saturday evening.   Prior to that time Mrs. Sylvain had been in good health, normally free from nervousness, without pain, of good posture, with head and neck erect and shoulders equal, and had been working regularly stamping linings in a shoe factory, with average earnings of $22 a week.

Immediately after the accident, she was for a time dazed and very nervous. She suffered immediate injuries in her nose (which bled), in the right side of her neck, her right shoulder, right upper arm, and back. She was generally sore for some time. The night of the accident she did not sleep at all. In the morning she stayed in bed while her husband went to church. At noon she arose, but remained in the house during the remainder of the day, while her husband went out in the afternoon.

After another sleepless night she went with her husband Monday morning to Municipal Court on a matter connected with the accident. Later in the day she consulted Dr. Almond. She did not go to work any day that week and continued to suffer pain and to sleep ill.

The following week she returned to work. The work wearied her excessively, caused her pain and made her nervous. She worked mostly on her nerves and found it impossible to perform a given amount of work in as short a time as normally. She was on piece work, however, and substantially maintained normal wages. This condition continued for seven weeks, and was accompanied by constant pain, difficulty in sleeping which required sedatives, and nervousness which caused abnormal irritability in the household.

At the end of the first week of work, she was found to have a wry neck, which was the result of the accident. It was accompanied by pain, made impossible a normal rotation of the head and neck, and left her chin turned to the left and her head tipped to the right. Dr. Almond was consulted the second time and on Sunday he x-rayed her neck. Monday she resumed work without interruption.

On June 29, after working seven weeks, she felt so much worse that she consulted Dr. Manning, who advised rest. She left her work for a little over a month, part of which she passed at home. For about ten days she visited on Cape Cod. During this time she had some deep massaging at the hands of an osteopath (the sister-in-law with whom she was visiting), and her nervous condition improved somewhat, though pain continued and the wry neck did not improve.

About August 1 she returned to work and continued at work steadily until January 1, when for the second time she saw Dr. Manning and took another week's rest. From the second week in January, 1937, to the date of the trial in March, she worked steadily.

At the time of the trial the wry neck and the pain persisted. She was still nervous, still had difficulty in sleeping. She had dropped in weight from about 145 pounds to 128.

The plaintiffs' medical testimony developed the fact that the remedy for her condition lies in the use of a Thomas collar designed to stretch the muscles in the right shoulder, remove the spasm there and give the muscles ultimate rest. The treatment is a painful one. The collar must be worn for six to ten weeks. Meanwhile the right arm must be carried in a sling, and the patient must do no work. After the period named, a lower collar must be worn for a month or six weeks. When she would get maximum relief, could not be surely stated, but relief from pain would be expectable in eight weeks, and possibly she could then resume work. But in three months time she could be at work with fair comfort. There would be need of baking and massage after the collars were removed.

It follows that the wife's loss of wages could not be calculated without speculation at more than the time she had lost prior to trial (less than seven weeks) plus the maximum time for treatment as suggested (thirteen weeks), a total of twenty weeks, which at her average wage would indicate a loss in earnings of $440. Unless she was negligent in not having this treatment sooner, of which there is no evidence, that would be a reasonable allowance.

The x-rays showed that there is a slight rotation on each other of the fifth, sixth and seventh vertebrae. One of the physicians described this as a permanent condition. But the evidence is also understood to be undisputed that it is the muscular and nervous condition of the shoulder that causes pain, nervousness and wry neck, and that this condition will yield to treatment. There is no evidence that the slight rotation alone, however permanent, is such that the plaintiff will suffer any pain or inconvenience from it.

As to her pain and suffering, the jury were to judge. They could not speculate that it would continue to be of any moment in another three months, making in all thirteen months at most to be compensated. The pain was the cause of her nervousness and irritability and loss of weight, and the jury would not be permitted to conclude that any damages to Mrs. Sylvain's person would last longer than the period named. They could have found, but apparently did not, that she was negligent in not sooner getting relief instead of aggravating her sufferings by working. Her claim that she worked because the factory needed her in order that manufacture might go on seems flimsy in view of undisputed testimony that her employer found a skilled worker to take her place while she was out.

Putting the case in the best light for her, she was awarded $3660 for fifty-seven weeks of suffering, during thirty-seven weeks of

which, however great her pain, she continued from choice to work. It is obvious that the Presiding Justice made no error when he found it to appear "clearly and definitely that the jury did not act properly in its consideration of the evidence," but were "misled, or failed to consider intelligently the evidence." *Wisutskie* v. *Malouin*, 88 N. H. 242, 246.

The other verdict stands similarly. Since the agreed damage to the car was $300, the husband was awarded $1600 for expenses and loss of *consortium*. There was some evidence that marital relations were "not normal," whatever that may mean. There was no evidence of the amount of doctors' bills, except testimony that the x-rays may have cost $15 each time. Aside from them, the wife had medical attendance only about four times. There is no evidence that any payments were made for massage to the husband's osteopath sister. The husband did suffer from his wife's nervous irritability. He had presumably, though not on the evidence, some loss of his wife's services in the home, but how extensive those were normally, when she was at work, does not appear, nor is it in evidence that the husband was at any expense for household work subsequent to the accident, or that he had to do it himself. With such evidence, in a case involving no property damage, it is only by a small amount that the husband could have escaped a directed verdict if it had been requested.

*Exceptions overruled.*

MARBLE, J., concurred in the result: the others concurred.